**UNITED STATES of America, Plaintiff,**

v.

**Robert L. CUMMINGS, Jr., Defendant.**

**No. CR 10–027 (ADS).**

United States District Court, E.D. New York.

Feb. 15, 2011.

Loretta E. Lynch, United States Attorney, Eastern District of New York, by: Charles N. Rose, Assistant U.S. Attorney, Central Islip, NY, for Plaintiff.

Peter J. Tomao, Esq., Garden City, NY, Mandery & Mandery, Mineola, NY, by: Edward J. Mandery, Esq., of Counsel, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

In a Notice of Omnibus Motion dated June 9, 2010, the defendant Robert L. Cummings, Jr., moved pursuant to the Federal Rules of Criminal Procedure, for the following relief relevant to the hearing held in this matter:

1. An order pursuant to Rule 12 suppressing evidence obtained by government agents after approaching the defendant Robert L. Cummings, Jr.'s vehicle on March 11, 2010;

2. An order pursuant to Rule 12 suppressing any statements obtained by government agents from the defendant Robert L. Cummings, Jr. on March 11, 2010;

3. An order pursuant to Rule 12 suppressing any evidence obtained by government agents from the search of the defendant's residence at 270 North Country Road, Smithtown, N.Y. on March 11, 2010.

## I. THE HEARING

### A. The Government's Case

Michael Antonucci is a Special Agent with the Drug Enforcement Administration ("DEA"). He is an experienced drug trafficking investigator. In late January 2010 the Smithtown Department of Public Safety received an anonymous letter that heroin trafficking was taking place in the maintenance yard of the Smithtown Highway Department. Following up that information, on February 5, 2010, DEA Agents arrested two employees of the Smithtown Highway Department for possession of heroin. One was Nick Dirienzo, who stated that the source of the heroin was another Smithtown Highway Department employee named Dennis Manning. At that time, seven glassine envelopes of heroin were recovered from Dirienzo. The glassine envelopes were stamped "Rockefella, two thumbs up."

Special Agent Antonucci was told by other law enforcement officers that Dennis Manning's source of heroin was located at 270 North Country Road in Smithtown. He was told this information by a Public Safety Officer and Park Ranger named Thomas Lohmann. Previously, experienced law enforcement officers had observed what they believed to be suspicious activity at 270 North Country Road in Smithtown. They saw individuals going into the residence for relatively short stays and vehicles pulling up to and in and out of the residence area.

Based on this information, Special Agent Antonucci conducted a surveillance at 270 North Country Road. At the residence, he observed a white Cadillac Escalade bearing New York plate number EVY8194 which was registered to Robert L. Cum-

mings, 21 Carol Lane, Mastic Beach, New York. Antonucci then ran a criminal history check on Robert Cummings, which revealed that Cummings had two prior convictions. In 2002, Cummings was arrested for possession with intent to distribute narcotics and possession of a loaded firearm. He pled guilty to a felony possession of narcotics. Also, in 2008, he was arrested for possession of a controlled substance and a firearm. He pled guilty to a misdemeanor possession of a controlled substance.

Law enforcement conducted a surveillance at the property in question on approximately five or six occasions from February 11, 2010 through March 11, 2010. Dennis Manning was observed in or near the vicinity of 270 North Country Road and the white Cadillac Escalade was also present. On February 24, 2010 a surveillance was conducted and the agents saw Dennis Manning in a Smithtown Highway Department truck arrive at 270 North Country Road. Manning exited the truck and entered the building for approximately five minutes, then he exited the residence, entered the truck and left. The defendant's Escalade remained.

On February 25, 2010, another surveillance was conducted by Antonucci. He saw Cummings enter his white Escalade, drive for a distance and meet a Smithtown Highway Department snow removal truck at the crest of a hill. The driver of the truck, Dennis Manning, exited the truck and entered the Cummings vehicle for approximately two to three minutes. Then Manning left the Cummings vehicle, reentered the truck and both vehicles departed. Cummings drove back to the residence at 270 North Country Road. Antonucci suspected that a drug transaction had taken place.

Another surveillance took place on March 3, 2010 at 270 North Country Road.

Cummings entered the Escalade and drove to Queens County and picked up another individual at 110th Street in Richmond Hill. They drove around together for the better part of the afternoon.

March 11, 2010, was a key date in this hearing.

On March 11, 2010, Antonucci was part of a surveillance team at 270 North Country Road. At approximately 12:58 pm, he saw Cummings enter the white Cadillac, drive south and pull into a Dairy Barn. He drove through the purchasing window, headed south and entered an adjacent shopping center parking lot. He then drove through the parking lot, circling slowly, at which time a second vehicle, bearing New York State registration number EME2288 drove behind Cummings' vehicle as it circled the lot. The two vehicles exited the lot and then both pulled over to a wooded area. The driver of the second vehicle was later identified as Jude Innocent. After the vehicles both pulled over to the side of the road in this wooded area, Innocent exited his vehicle and entered the defendant's Escalade.

At that time, Special Agent Antonucci activated his police lights and pulled in front of the Escalade and exited his vehicle and came up to the driver of the Escalade. Antonucci described what occurred:

And with my police badge on, I exited my vehicle, came up the driver's side of Mr. Cummings' vehicle.

The window was opened. I told Mr. Cummings to put his hands on the steering wheel, and I told Mr. Innocent not to move.

At that point, for my safety, I opened the driver's side door, at which time I saw a stack of money in Mr. Cummings' lap.

I subsequently removed Mr. Cummings from the vehicle. At the same

time, law enforcement officers removed Mr. Innocent from the passenger side and stated that they found at some point thereafter—that they found a large sum of heroin on Mr. Innocent. And both Mr. Cummings and Mr. Innocent were placed under arrest.

Tr.* at 24.

Agent Egan, who was in charge, spoke to the defendant. The defendant wanted to know what was happening. He was told he was under arrest for possession of drugs with respect to the transaction that just occurred. Egan told the defendant that "we would go ahead to get a search warrant for his residence." At that point, Cummings was calm and appeared to want to cooperate with law enforcement. Agent Egan asked the defendant if he was willing to cooperate and "if he gave us a consent to search for his apartment, that would be part of the process that would happen next." Tr. at 26. Cummings was concerned that his wife should be part of the consent to search the apartment. Again, the defendant was apparently relaxed and he was allowed to smoke. According to Egan, "It was a calm atmosphere."

Agent Egan asked the defendant if there was anything in the house to be concerned about. The defendant said there was a pit bull and a pistol inside, which the defendant said he had a permit for. He then said it was a rifle, not a pistol, and that it was a pistol-rifle. At that point, Cummings expressed a desire to cooperate. He was driven back to his residence at 270 North Country Road and the agents said that they would allow him to speak to his wife, Vanessa Torres.

At the Cummings home, agents went up to the stoop and knocked on the door. This was approximately 2 pm. At that point, Ms. Vanessa Torres came to the door in one-piece wool pajamas. She asked to go back in the apartment to change clothes. Concerned about the firearms in the apartment, the agents said "No." She closed the front door behind her, walked to the police vehicle that Cummings was in and got in the back and spoke to Cummings. She spoke to Cummings for ten to fifteen minutes. They spoke about the consent to search their residence. Special Agent Antonucci testified that:

Q. Did they agree to give verbal consent for the search at the time?

A. Yes.

MR. MANDERY: Again, my objection is he—

THE COURT: Yes. When you say "they," who agreed?

THE WITNESS: Mr. Cummings and Ms. Torres, your Honor.

THE COURT: When you say that, what did they say.

THE WITNESS: Your Honor, again, the sum and substance, they were willing to allow us to search their residence.

And at that point I presented them with a Drug Enforcement Administration form 88, consent to search.

THE COURT: Who presented them?

THE WITNESS: I did, your Honor.

THE COURT: You presented them with what kind of form?

THE WITNESS: A DEA form 88, sir.

THE COURT: A DEA form 88?

THE WITNESS: Yes, sir. 88.

THE COURT: What is that?

THE WITNESS: A consent to search form, your Honor, written consent to search form.

* Tr. refers to the Hearing Transcript.

BY MR. ROSE:

Q. Agent Antonucci, showing you what has been marked as 3500–MA–1, do you recognize that form?

A. Yes, sir.

Q. What is that form?

A. That's the DEA form 88, a copy of his consent to search form. It was presented to Ms. Torres and Mr. Cummings.

Q. And were you present—did you review that form with them?

A. Yes, I did.

Q. And were you present when they signed the form?

A. Yes, I was.

Q. And whose signatures appear on that form?

A. Robert Cummings, Vanessa Torres, myself and Agent Francis Rau.

THE COURT: Agent who?

THE WITNESS: Agent Francis Rau, R–A–U.

BY MR. ROSE:

Q. Did you observe the signatures on that form?

A. Yes.

Q. You observed them sign the form?

A. Yes, sir. Yes, I did.

MR. ROSE: The government offers Government's Exhibit 3500–MA–1 into evidence.

Tr. at 31–33.

Special Agent Antonucci testified that the defendant's demeanor was "calm and cooperative" when he signed the consent to search. Ms. Torres "appeared nervous but calm, not excitable." The date on the consent was corrected and the defendant initialed the correction with a "RC" to acknowledge that a correction was in fact made on the document.

Cummings and Torres were then led out of the vehicle to the entrance of their apartment at 270 North Country Road. There was a pit bull in the apartment so that the agents escorted the defendant and Ms. Torres inside the apartment. Cummings was placed on a couch and Ms. Torres walked to the back of the apartment to secure the dog. The search commenced at about 2:30 pm and ended at approximately 3:30 pm.

On cross-examination of Agent Antonucci it was revealed that Special Agent Charles Bernard was the author of the investigative reports involving this incident. Also, Antonucci had conducted a number of surveillances at the 270 North Country Road residence in February and March 2010, but did not apply for a search warrant. However, there was a draft of a search warrant in the office of the Suffolk County District Attorney. Agent Bernard was in contact with the Office of the Eastern District United States Attorney's Office while the defendant and Ms. Torres were sitting in the police vehicle.

On cross-examination, the defendant's attorney elicited the following testimony about the relevant events. On March 11, 2010, Antonucci and other agents went to the residence to establish surveillance. It was a random surveillance; there was no advance tip that a drug deal was to happen that day. On February 5, 2010, two men, Nicholas Casizzi and Nicholas Dirienzo were arrested. Antonucci had read reports with regard to statements by these two men. Apparently, Dirienzo stated that Dennis Manning sold heroin to him. Dirienzo never mentioned the name of the defendant nor did he refer to the 270 North Country Road address nor did Casizzi in his statement. It was brought out that Dennis Manning works for the Town of Smithtown and is the cousin of the defendant.

In the report of Special Agent Bernard, it stated that Manning purchased heroin on a daily basis from 270 North Country Road, on his coffee break. Between February 11th and March 11th, Antonucci went to the area of 270 North Country Road six times looking for drug activity and excessive vehicular traffic. However, he conceded that with the vehicles that could have been lawfully at the premises, there was not "excessive vehicle traffic at the location." Also, there was a certain doubt raised as to whether Manning was purchasing heroin on a daily basis at 270 North Country Road, while on his coffee breaks. Therefore, by March 11th, the agents could not verify that Manning was purchasing heroin at the 270 North Country Road residence.

As to his criminal history, on September 19, 2008, the defendant was arrested involving the drug methadone and a knife that was found in the console of his vehicle. However, the defendant plead guilty the next day to criminal possession of a controlled substance with a sentence of time served. The defendant also had been arrested on July 4, 2002. He was in a car with a firearm in the rear seat. The defendant did not plead to possession of the gun and received a sentence of five years probation. So that at the time of this occurrence, the defendant did not have any violent felony convictions.

Also, prior to March 11, 2010, Antonucci had never seen the defendant engaged in the sale of heroin. Antonucci did observe activity he "believed may have been drug transactions, but to actually say he observed a drug transaction," he cannot say. Tr. at 98. Also, Antonucci never spoke to anyone who purchased heroin from the defendant or at the 270 North Country Road residence. So that other than the agents' observations and the February 5th telephone call, there was no independent corroboration of drug activity at 270 North Country Road until March 11th. Antonucci had no information that the defendant was selling heroin from his white Cadillac Escalade, nor did he speak to anyone who gave him such information.

Prior to the March 11, 2010 incidents, the last surveillance at the house was on March 3, 2010. Also, Antonucci had no tips or firm confidential informants. That day, March 11, 2010, the agents established surveillance at 270 North Country Road early in the morning. At approximately 12:58 pm, he saw the defendant exit his apartment. There were eight officers doing the surveillance. Antonucci was alone in his own car. He saw the defendant exit the residence and enter his car. Antonucci decided to follow him. The defendant drove to a Dairy Barn and stopped at the window. He then drove to a Waldbaums at approximately 1:05 pm. The defendant then entered the shopping center lot; drove south on Route 111 and turned into Darling Avenue and pulled over near a wooded area. Antonucci had seen another car, driven by Mr. Innocent driving down Darling Avenue behind the defendant's car. The two cars then parked in close proximity. He was the nearest agent car behind the defendant and Mr. Innocent. He saw Mr. Innocent exit his car and enter the defendant's car. At that time, Antonucci was a half block and maybe 200 yards away.

Antonucci drove toward them and then made the decision to stop them. He activated his flashing lights, cut off and blocked the defendant's vehicle. He exited his car and went to the driver's side of the defendant's vehicle. As he approached the defendant's vehicle, he saw that the driver's window was open. His weapon was not drawn. His shield was out. He identified himself as a police officer. Antonucci said, "Don't move and put your hands on

the steering wheel." He then opened the driver's side door. That was for his own safety. As he opened the car door he saw some money. He saw a bundle of money in the lap area of the defendant. He saw the money between the defendant's groin and mid thigh, dead center from the steering wheel. The money was in plain view; a bundle of money laying on the defendant's lap. The money was held together by a rubber band. At that point; he ordered the defendant out of the vehicle, by saying, "Step out of the vehicle." Also, at that same time, Mr. Innocent was being removed from the other side of the vehicle by two other detectives. Antonucci physically pulled Cummings out of the vehicle. He held his left wrist. The defendant was compliant.

At that time, the defendant and Mr. Innocent were not free to leave. Questioned by defense counsel as to whether he had a "hunch" that Cummings was engaged in illegal conduct, Antonucci responded, "More than that, I had reasonable suspicion." Tr. at 125. Both Mr. Innocent and the defendant were then searched. He searched the defendant and someone else searched Mr. Innocent.

After he removed the defendant from the vehicle, Antonucci recovered the money which was on the floor at the driver's side of the defendant's vehicle. A search of Mr. Innocent revealed that he possessed a "large sum of heroin." At that point, he cuffed the defendant, Mr. Innocent was also cuffed and both were told that they were under arrest. Antonucci placed the money he recovered from the car in a sealed evidence bag. He did not count the money. The defendant wanted to speak to "whoever was in charge." That was Agent Edward Egan. At first the defendant declined to sign the evidence bag, then he later agreed to sign. Antonucci denied that he applied pressure to the defendant to compel him to sign the evidence bag containing the money.

Then the agents took the defendant back to his home so that he could confer with his wife, Vanessa Torres, to obtain his consent to search his home. At that point, Antonucci did not have any information that the defendant had drugs in the house. There came a time when Cummings allowed him to search his apartment. The agents first raised the subject of that consent to search on the street when the defendant was stopped and eventually arrested. The defendant was cuffed in the front. According to Agent Antonucci, ". . . he asked to smoke, and he was relaxed and calm." Tr. at 146. The defendant agreed to allow the agents to search his apartment, "after conferring with his wife." Tr. at 148. The defendant was told if he did not agree to the search, that a search warrant would be obtained. Antonucci testified that during this time the defendant was cooperative. Agent Egan told the defendant that they were interested in who is supplying him with drugs, "we're looking to go up the ladder." Tr. at 152. Also, the defendant was advised that if he consented to the search, "he would show cooperation." Tr. at 153.

The agents and the defendant in Antonucci's car then drove from the initial scene and where the defendant was arrested to his residence. No promises concerning Vanessa were made to the defendant. When they arrived at defendant's apartment at 270 North Country Road, Agent Antonucci was one of the parties that went to the front door and knocked on the door. Vanessa came to the door wearing pajamas. Agent Egan spoke to her. He told her that her husband was arrested, was in the vehicle in the driveway and that he wanted to speak to her. Vanessa asked to put some clothes on and was told, "no, you have to come out how you are," and they

escorted her to the defendant in the car. Vanessa shut the door behind her and went to speak to Cummings in the agent's car. Both were seated in the back seat. They were not happy and were in shock as to what was happening. They were whispering, but were talking about the agents' request for permission to search the apartment, and "her recognition was more or less in agreement that they wished to do it." Tr. at 162.

Agent Egan asked Cummings, "was there anything inside we should know about," Tr. at 163, and Cummings told the agents that there was a weapon inside the apartment. At first he said it was a licensed pistol, then a rifle, and then a "pistol-rifle."

Cummings and Vanessa Torres signed a written consent to search form. Antonucci had provided the form for them to sign. There were preprinted words on the consent to search form, including the words "I have not been threatened or forced in any way" and "I freely consent to this search." Cummings signed the consent to search form on the back of agent's vehicle where he was sitting with Vanessa. He was front cuffed at the time of signing, so that he could sign the form, and Ms. Torres signed on the arm rest. No one had made any promises or threats to the defendant and Vanessa, prior to their signing the consent, nor did Antonucci tell the defendant or Vanessa that they had to sign the consent form.

On redirect examination, Antonucci testified that he had information that Dennis Manning obtained heroin at 270 North Country Road on a daily basis, in the mornings. He also stated that Manning, in his Smithtown Highway Department truck was seen at 270 North Country Road on February 11, 2010, February 12, 2010, February 22, 2010, February 24, 2010, February 25, 2010, in the presence of the defendant, and on March 3, 2010. Further, in the defendant's interview with the agents, he stated that on February 25th, he conducted a heroin for methadone transaction with Manning on that day. As to the March 3rd surveillance, the defendant stated that there was "a transaction occurring with Mr. [Logan] Sanchez." Tr. at 182.

Charles K. Bernard is a Special Agent with the Drug Enforcement Administration, currently assigned to the Long Island District Office. On March 11, 2010, two persons were arrested by his group. One was the defendant Robert L. Cummings and the second was Jude Innocent. He and his fellow agents had followed a Cadillac Escalade driven by the defendant from his residence at 270 North Country Road. The Cadillac had been followed by a second vehicle, a Chevrolet driven by Mr. Innocent, from a parking lot at Waldbaums in Smithtown. Both cars pulled over to the side of the road on Darling Avenue. He approached the passenger side where Mr. Innocent was seated. He opened the passenger door and asked Mr. Innocent to step out. A pat down of Mr. Innocent revealed that he possessed four sleeves of heroin. Each sleeve consisted of 100 wax paper glassine paper bags. Cummings and Innocent were arrested. Agent Bernard filled out the top of the consent form, and had no further involvement in the signing of the form.

Thereafter, Agent Bernard followed the Antonucci car to 270 North Country Road. He approached the residence with other agents and knocked on the door. A woman who had been identified to the agents as the defendant's wife, opened the front door. She was asked to come outside. She complied, closed the door behind her and went to the vehicle in which Cummings was seated about 50 feet from the front door of the house. At that time,

Agent Bernard was making telephone calls to the Suffolk County District Attorney's Office and to the office of the Eastern District United States Attorney. Based on the quantity of heroin found in the possession of Mr. Innocent, Bernard thought that this would meet the federal guidelines as to prosecution in the federal court. The federal authorities were interested.

The agents then proceeded to obtain the federal DEA form 88, consent to search. After Agent Bernard received the written consent of both Cummings and Torres, he secured the document and proceeded with the search. The search commenced at approximately 2:30 pm and ended about 3:30 pm, about an hour later.

Later in the day, Agent Bernard interviewed the defendant at the District Office. Prior to the interview, Bernard stated:

Q. Before you interviewed Mr. Cummings, what if anything did you advise him of?

A. I presented him with my advice of rights card, a DEA form 13–A, better known as the Miranda warnings. I verbally recounted each of the rights off the card to the subject.

Q. Showing you what has been marked as Government's Exhibit 2, do you recognize that?

A. I do sir.

Q. What is that?

A. That is in fact a photocopy, front and back, in both English and Spanish, of my Drug Enforcement Administration 13–A.

Q. Is that the card that you read the rights of the defendant off of?

A. Yes.

Q. On that date, March 11th—

A. March 11th—

Tr. at 197.

Again on voir dire by attorney Tomao, the following testimony was given by Agent Bernard:

Q. Let me stop you there.

What specifically did you ask him about his understanding, if anything, about his rights that you read to him?

A. Oh, I'm sorry. I asked him, as it says on the card, if he understood the rights that have been presented to him, and he acknowledged that he did.

Q. What else did you ask him?

A. If he wanted any question posed on the card—if you would agree to answer questions without the presence of an attorney. And he agreed to answer questions and to assist in the investigation.

Q. How was the defendant's demeanor at the time?

A. Calm and cooperative.

Q. Was the defendant handcuffed at that time?

A. No, sir.

Q. During the interview, did anyone take notes?

A. I did, sir.

Q. And at the end of the interview, what did you do with those notes?

A. At the end of the interview, I in fact read them back verbatim to the subject and asked Mr. Cummings if they in fact represented what we had just discussed. And he concurred with the notes being an accurate reflection, and I asked him to initial the lower right corner of each page.

Q. Showing you what has been marked as Government's Exhibit 3500–CKB–2. Take a look at that for a second.

THE COURT: What is the number again?

MR. ROSE: 3500–CKB–2.

A. This is a photocopy of the notes that I took of that interview in question.

MR. ROSE: The government offers the exhibit into evidence, your Honor.

\* \* \* \* \* \*

THE COURT: 3500–CKB–2 in evidence, Government's exhibit.

(Whereupon, Government Exhibit 3500–CKB–2 was received in evidence.)

BY MR. ROSE:

Q. Who signed this report?

A. The subject, Mr. Cummings, initialed each page, and then I countersigned the last page along with Investigator Thomas Lohmann.

Q. Was Mr. Lohmann present during the interview?

A. For the entire interview, yes, sir.

THE COURT: Who was present?

THE WITNESS: Thomas Lohmann, your Honor.

Tr. at 200, 201 and 202.

After this interview, at the District Office, which lasted one-half hour to forty-five minutes, the defendant had two requests. He wanted to eat and he wanted to smoke. He was furnished with a sandwich and a cigarette. Later that night, the defendant was transported to the Third Precinct of the Suffolk County Police Department in Bay Shore.

On March 22, 2010, Agent Bernard took photographs of the money taken from the defendant on March 11th. He testified that the money in the photographs "is exactly how it appeared when it was taken from the ... Cadillac Escalade on March 11th." Tr. at 232. Apparently, the money was in the amount of $2,708, including eighteen $100 dollar bills. Also in evidence is Government's Exhibit 13, which is a photograph taken by Agent Bernard of a glass-topped coffee table. Bernard testified that on the table were two pistols. One was a 9 mm Rieger pistol with the serial number defaced. (*See also* Government's Exhibit 22 showing the two handguns.) In addition, on the table was a bin with wax glassine baggies containing a stamp bearing the logo Sopranos. Government Exhibit 14 is a photograph showing a wooden serving tray containing glassine bags also with the logo Sopranos.

On cross-examination, Agent Bernard testified that he saw the money in the defendant's car. He also saw Agent Antonucci remove the money from the vehicle and place the money in an evidence bag. He again related the incidents of March 11th. There were a total of eight law enforcement officers involved. He arrived at the area of the Cummings residence at about 8:45 am. He prepared a written plan for the day's activities. Three or four vehicles were involved. Agent Bernard stated that Dennis Manning was the linchpin of their investigation that day.

Q. Okay.

What about Dennis Manning?

A. Dennis Manning had been observed during several of our surveillances at your client's residence and the plan that day was to arrest him after engaging in a drug deal and see if he was willing to cooperate against your client.

Tr. at 286.

Although, he was a basis for the surveillance, Manning was not present during the events that took place on March 11th. According to Bernard, on March 11th Manning was on duty in a Smithtown Department of Public Works Highway Department truck as a passenger. So that, although Manning was a precipitating cause for the investigation, even in his

absence, the surveillance did produce the events described in detail above. In an exhaustive cross-examination, Agent Bernard reviewed the events of March 11, 2010.

Agent Bernard was outside the subject residence at about 1:00 pm and saw the defendant in his Escalade go to the Dairy Barn. He was one of the several cars following the defendant as he pulled alongside the road followed by Mr. Innocent in his car. He saw Antonucci's lights flashing and saw him stop in front of Cummings' Escalade. Mr. Innocent got out of his car and went into the defendant's car. He and another officer approached the passenger side of the Cummings' vehicle. Antonucci was already at the driver's side. Bernard had his badge around his neck and it was visible. He did not have his gun out and no firearms were exhibited by the other officers. Shortly after Mr. Innocent stepped out of the car, he patted him down. He found four sleeves of heroin on Mr. Innocent's person in the pockets in the front of his hooded sweatshirt. Bernard did not see the money on the defendant's lap; his first view of the money was when the defendant exited from the car. These arrests took place at approximately 2:13 pm. No weapons were recovered at the scene of the arrest.

Although no weapons were found in the defendant's car, Agent Egan told Bernard that the defendant told him that there was a firearm in the house. Bernard had checked the defendant's criminal record and was aware of the defendant's two prior convictions.

After the arrest at the scene at the side of the road, the agents and the defendant went to 270 North Country Road. Agent Bernard prepared the consent to search form and he wrote the language at the top portion of the form.

In a somewhat disturbing incident, defendant's counsel brought out in cross-examination that a statement made by Agent Bernard in the complaint in this case may not be true. (Dft's Ex. F). In paragraph 2 of the complaint prepared by Agent Bernard on March 12, 2010, he stated that, "Debriefing of individuals arrested in 2010, as well as other information developed during the course of the investigation, indicated that an individual residing at the target residence was distributing heroin." Bernard conceded that this statement was not true. However, the Court notes that later in his redirect examination, Bernard testified that the statement *was* true.

Bernard was questioned at length about the information that DEA had concerning Dennis Manning and his alleged obtaining heroin on a daily basis from the Cummings residence during his coffee break in the morning. Bernard received this information from Investigator Thomas Lohmann. No other individual told him that someone at the target residence was distributing heroin. Bernard conducted surveillance at 270 North Country Road starting in December, 2009, based on the information by Inspector Lohmann; who advised him that this was a potential drug supply site. In February, 2010, he also obtained information that Dennis Manning was purchasing drugs at that location. This was followed by the arrest of the two men named Canizzi and Dirienzo. Bernard further testified that North County Road is a main wide road; and was heavily trafficked.

Bernard also took a photograph of the material taken from Mr. Innocent on March 11th (Dft's Ex. I), showing the sleeves containing glassine envelopes. The powder in the glassine envelopes turned out to be heroin. He also took photographs of the house at 270 North Country Road, including the accessory building, which is the apartment occupied by Cummings and Ms. Torres. (Dft's Exs. M, N, O and P). There were other people

living at the target residence. In a search to determine who was living at 270 North Country Road, Cummings did not appear as one of the residents. Agent Bernard ascertained that Irene Castiglione was the owner of the residence.

The search at the residence was terminated about 3:30 pm and Cummings was then taken to the DEA office. Bernard knew that the defendant would be held in custody until the following day when he would be arraigned. The defendant was taken to the DEA office to be interrogated. He did not give the defendant a waiver of speedy arraignment form to sign, even though he knew that the defendant was not going to be arraigned until the following day. At that time, at the DEA office, Agent Bernard read the DEA form entitled "Oral warning to be given to a suspect prior to interrogation." (Gov't Ex. 2). Bernard does not recall if, in addition to reading the form to the defendant, he also handed him the card so that he could read it himself. The DEA form gave Cummings the usual and complete *Miranda* warnings as follows:

ORAL WARNINGS TO BE GIVEN TO A

SUBJECT PRIOR TO INTERROGATION

Before we ask you any questions, you must understand:

— You have the right to remain silent.

— Anything you say can be used against you in court.

— You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

— If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

Do you understand?

Are you willing to answer some questions?

Government Ex. 2.

The money that was seized as a result of the March 11th arrest of Cummings and Jude Innocent was deposited in a bank account, and therefore its individual identity was lost except for the bank deposit slips. Strangely, Bernard testified that their standing order is not to count the money that is seized. Bernard testified that, in this case, the currency seized from the defendant had an evidentiary value and the policy is "to bag it, make an appointment with Brinks, and get an official count." Tr. at 441.

At DEA headquarters, Agent Bernard questioned the defendant in the presence of Investigator Thomas Lohmann. As stated above, Bernard took notes of the interview. No recording was made. His notes reveal that he started the interview at 6:50 pm in an interview room. Cummings did not appear to be ill at the time Bernard questioned him. The interview took between thirty-five and forty-five minutes. After the interview was concluded, the defendant initialed the pages of Bernard's notes. Bernard had read back his notes to the defendant so he could make changes. None were made. The interview consisted of questions by Bernard and answers by Cummings; it was not a narrative answer.

On his redirect examination, Bernard testified, contrary to his responses on cross-examination, that the following statement contained in the complaint which summarized the DEA investigation prior to March 11th, signed and sworn to him, was true:

2. Since early February 2010, the DEA has been conducting an investigation of a residence in Smithtown (the "TARGET RESIDENCE"), in Suffolk County, New York. Debriefing of indi-

viduals arrested in 2010, as well as other information developed during the course of the investigation, indicated that an individual residing at the TARGET RESIDENCE was distributing heroin. The DEA later learned that the defendant ROBERT L. CUMMINGS, JR. resided at the TARGET RESIDENCE.

In making his notes, Bernard made use of a digital audio recorder and wrote his report based on the information documented by the recorder. Also, Bernard testified that he prepared a written plan for the March 11th activities. Portions of that plan were received in evidence as Government's Exhibit Number 3500–CKB–33.

Finally, Bernard testified that the information he had from Mr. Innocent about the amount of money that he paid for the drugs was the sum of $2,000. Therefore, a count of the money would be relevant as to whether Mr. Innocent was telling the truth.

After Bernard's testimony was concluded, the Government rested in this suppression motion hearing. At that point, the defense asked the Court to grant his motion to suppress the evidence that was obtained subsequent to the arrest of Robert Cummings. The Government opposed this motion. The Court reserved decision on the defendant's motion at the conclusion of the Government's case.

## B. *The Defendant's Case*

Vanessa N. Torres testified that Rayne Naldi is her stage name. She has a romantic relationship with the defendant, Robert Cummings. He is her fiancé. They have a license to be married but have not yet had a ceremony. Starting with the question to her in which she referred to herself as Cummings wife, Torres asserted her Fifth Amendment right against self-incrimination and refused to answer most of the questions addressed to her.

The witness was then asked to wait outside the courtroom while counsel for the defendant made two applications to the Court. First, he asked the Court to direct Torres to answer "as I believe she has not properly asserting a Fifth Amendment claim regarding these questions." Tr. at 336. Alternatively, counsel for the defendant asked the Court to direct the Government to grant her immunity so that she can testify. The Court ruled that the questions posed to Torres may incriminate her as far as aiding and abetting, and therefore denied the defendant's first application. Also, the Court denied the defendant's second application, namely to direct the Government to grant her immunity. The Court ruled that under the facts in this case, that decision had to be made by the Government. The Court stated that "I am not going to grant her immunity in the face of the Government telling me that they may bring charges against her." Tr. at 339.

Jerin Rosas is a paralegal in the office of Peter J. Tomao, Esq., the attorney for the defendant. She has been with him for four years. She has a paralegal studies associate degree. Ms. Rosas was called to testify about what Ms. Torres had told her and attorney Tomao about the relevant events. As part of her duties, she meets with potential witnesses in Mr. Tomao's cases. She was present, along with Mr. Tomao in two interviews of witness Vanessa Torres. These interviews were on March 17, 2010 and July 29, 2010.

Counsel for the defendant asked Ms. Rosas, "What Ms. Torres told you when you when the DEA came to the residence on March 11, 2010?" Ms. Rosas then testified that Ms. Torres stated that she was in bed in pajamas when she heard a knock on the door. At the door, DEA agents asked her if she was Vanessa. She said yes.

Then the agents told her they believed there were drugs in the house and asked her to step outside. Although she was nervous, she did what the agents told her to do. She went outside and the agents told her to go to the defendant who was in a DEA vehicle. Ms. Torres then asked the agents if she could go back into the house to put on some clothes; at which point, they told her if she did that she would be arrested. So she followed the agents to the vehicle. She was nervous, scared and crying. Ms. Torres saw the defendant in the vehicle. The defendant consoled her and told her everything would be okay. Ms. Torres entered the vehicle. The DEA agents told her that she had a couple of minutes to decide whether she would allow them in the house. She was scared and thought that if she did not let them in, they would arrest her. At that point, she said okay to them, "and they took her and Mr. Cummings into the house, at which point they had them sit on the sofa." Tr. at 482. Ms. Torres was hysterical, scared, nervous and crying. After a couple of minutes, maybe ten minutes, while she was on the sofa, "one of the agents handed her a piece of paper, told her she has to sign." Tr. at 483. Cummings then asked the agents what is was they wanted her to sign. The response was, "Just a search. Sign." Tr. at 483. Ms. Torres signed the paper. She was not sure she signed it before or after the search had begun.

As part of her duties, Ms. Rosas sent an application to the Town of Smithtown for public access to certain records, under the Freedom of Information Law. The request was for a work assignment for the period of January 1, 2010 through March 15, 2010, for the Town employee Dennis Manning. Ms. Rosas also spoke to one Irene Castiglione regarding the lease for the apartment at 270 North Country Road. Ms. Castiglione faxed certain documents to Ms. Torres' office. Among the documents faxed was a "Lease/Rental Agreement" dated August 17, 2009, between Ms. Castiglione as Lessor and Vanessa and Robert Cummings as Lessees, for the one bedroom apartment at 270 North Country Road for one year ending August 15, 2010. Dft's Ex. T.

On cross-examination, Ms. Rosas testified that Ms. Torres is not married or engaged to Mr. Cummings, even though Ms. Torres signed the lease of the apartment as Vanessa Cummings. Ms. Torres told her that, initially, the DEA agents knocked on the door of their apartment, but did not enter. Instead, Ms. Torres went outside. In the car with the defendant, he consoled her and told her "everything would be okay." Tr. at 493. Nowhere in the notes of Ms. Rosas does it say that Ms. Torres refused to consent to let the DEA agents search the house or that she and Cummings refused to sign the consent to search. When Mr. Tomao asked Ms. Torres if there were drugs in the house, she did not answer, and did not deny that fact. "She did not say 'no'." Tr. at 499.

Ms. Rosas also conceded that her notes do not say that Ms. Torres told her that she was scared or that she thought she was going to be arrested if she returned to the house or if she refused to consent to the search. Her notes in quotes are word for word what Ms. Torres stated, otherwise it is the impression of Ms. Rosas as to what Ms. Torres said. Ms. Rosas was not aware that Ms. Torres takes prescription drugs for depression. Ms. Torres did not review or sign her notes. The subject of drugs and guns in the apartment was apparently not raised in these interviews. Ms. Rosas did not recall if Ms. Torres said either that the defendant's rights were violated or that he was interrogated and forced to sign documents. Also Ms. Tor-

res did not say that the defendant had a heroin problem.

The final witness for the defense was the defendant Robert Cummings. On March 11, 2010, he was living at 270 North Country Road in Smithtown with Vanessa Torres. Their apartment was an accessory apartment and did not occupy the entire building. Although he received a marriage license in New York in April 2009, they were never married. However, they held themselves out as being married and both referred to Vanessa as his wife. Vanessa moved to New York from New Mexico to pursue her music and writing endeavors. Vanessa performed under her stage name Rayne Naldi. She recorded some music under that name, which was published on line and by compact discs. Cummings also performed under the name of "mysterious." He published his music on compact discs, on line and through magazines and DVDs. Dft's Ex. G. In the photograph in evidence showing stacks of money and a hand gun, there is a photograph of a compact disc showing the defendant under the heading of "mysterious." Also Dft's Ex. H is a photograph of the defendant holding stacks of money. He wanted to show that he was a tough person with lots of money; as part of his musical career.

Prior to the time he was arrested, the defendant was using heroin, "[e]very day, multiple times throughout the day." Tr. at 217. He had taken heroin on the day he was arrested. Dennis Manning is his cousin and his friend. He and Vanessa visited with Dennis and his girlfriend, Janelle, at each others' homes. In fact, Vanessa worked at a nail salon owned by Janelle.

On March 11, 2010, the date of his arrest, he had used drugs two or maybe three times. When he left his house about 1 pm, he was under the influence of drugs. When he left that day, there were two guns in his house. The "smaller" gun was located under the mattress of the bed in the bedroom. The second gun was in a drawer in the bedroom. That was the gun shown in the photographs. Also, there was heroin in the kitchen. In addition, there was packing material consisting of little bags in the drawer in the bedroom. When he left the house, there were no drugs or guns on the coffee table in front of the couches, as shown in the photograph in evidence. Later, in his testimony, the defendant stated that he left the drugs in the kitchen under a sheet. He also kept drugs in a safe in his bedroom closet. He would not, ordinarily, keep drugs and guns where they could be seen.

When the defendant left his house a few minutes before 1 pm in the afternoon of March 11, 2010, he was still feeling the effects of the drugs. He was drowsy and not in the right frame of mind and his mind was not clear. His mind in Court is clear because he has not used drugs after his arrest on March 11th. Also, the drugs he had used on March 11th affected his ability to estimate the amount of time that had passed. The defendant left his house and entered his white Cadillac Escalade. He went to the Dairy Barn then to Waldbaums parking lot. The Dairy Barn is across the street from the Waldbaums parking lot on Route 25A on Main Street in Smithtown. So that, he explained that he drove through the Dairy Barn to the Waldbaums parking lot. Then, after a time, he drove out of the Waldbaums parking lot. He became aware of another car following him. This car was driven by Mr. Innocent, the co-defendant.

The defendant drove "a couple of blocks" to a residential neighborhood, and pulled over to the side of the road. Here there is a difference between the Court's notes and the Court Reporter's Record. The Court noted that after the defendant

pulled over to the side of the road in the residential neighborhood, Mr. Innocent got into the car on the passenger's side. The record indicates that Cummings pulled over to the side of the road and Mr. Innocent got into the passenger side of his "truck." The defendant later clarified that when he said "truck" it was his Cadillac Escalade, an SUV. To the best of his recollection, the Court recalls that Mr. Innocent entered the passenger's side of the Cummings vehicle.

Cummings then observed a car with lights on pull up in front of his vehicle. Then two agents came up to his vehicle; one, later identified as Agent Antonucci, came to his door and asked Cummings to keep his hands where he could see them. The defendant did not know that Antonucci was an agent; he was not wearing a law enforcement uniform and he does not recall if the agent was holding a weapon. A second person also approached his car on the passenger's side. It was not Agent Bernard. The person on his side of the car—the driver's side—opened the car door and physically grabbed him and pulled him out of the car. He then asked Cummings if there was any drugs or guns in his vehicle. Cummings said "No." He was then walked to the front of his car by Agent Antonucci. According to the defendant, Agent Antonucci did not identify himself as a law enforcement agent. The Court doubts this testimony. The defendant was then placed on the hood of the car, searched, patted down and handcuffed. Eventually, he was told that the man who searched him was a law enforcement officer and he was shown a badge, "eventually." During the search, the agent took his wedding ring, his wallet and his identification. These items were placed in an evidence bag. They asked him to sign the evidence bag with the money in it. At first he refused. The agent said he had to sign, and so, with no

choice, he signed the evidence bag containing the money. He does not recall if he signed the evidence bag containing his property.

After he was cuffed, Cummings was questioned about the guy in his car. He told the agents that he knew the man and his wife from his music. At that point, no one gave him any *Miranda* warnings, or told him that he had a right to remain silent or had a right to an attorney. Also, he was being taunted in that he was told that they knew that there were drugs and guns in his home. He made no response to these statements. He asked to speak to someone in charge so he could know "what's going on." The agent then sat him down on the grass across the street and kept asking him questions, "Where do I get the drugs from" and they knew he was a drug dealer. As he was resting there Agent Bernard came over to him and showed him a picture and said to "give it up ..." Agent Bernard never gave him his *Miranda* rights, but kept asking him about drugs and money.

Cummings testified that he was the brought back to the hood of his vehicle and the agents brought money out wrapped in a rubber band saying they found the money in his vehicle. They asked him if the money was his and he said no. He was shown some photographs of his car and told that the agents had followed him; and "it's time to give it up." At that point, still no *Miranda* warnings. He declined to respond. Cummings described the scene as "pretty chaotic," everybody was running around.

The agents then asked him for permission to search his house. Agents Antonucci and Egan said if he did not consent to the search of his home, they would get a search warrant. They asked him if anybody was in his home and he told them his

wife Vanessa was in the house. Again they asked him if he would sign a consent to search his home. He said no and they said "we'll get a warrant." A few minutes later they came back to him and again asked him to consent to search his home. Cummings then responded that, first, he needed to speak to his wife. They then told him that "if there is anything at the home that she could be arrested." Tr. at 245. Then the agents told him if they had to get a warrant and go into the home themselves that Vanessa would be arrested but if he signed a consent to search, they would not arrest her. Also, he was asked if there were dogs in the home. He responded that there were three dogs in the house. The agents then told him, that, depending upon how it goes, the dogs would be impounded, or, if the dogs were a threat, "[t]hey would do whatever they had to do to protect themselves." Cummings understood that to mean, that they would shoot the dogs.

While on the street, the agents asked Cummings if there were any guns in the home and he said, yes. He also told them that he had drugs in his home. Again, no *Miranda* warnings were given to him. Asked to describe the agents' demeanor when questioning him, Cummings responded that "the demeanor was taunting, pushy, kind of laughing, jumped around." Tr. at 250. They were putting him under a lot of pressure by calling him a drug dealer.

Cummings testified that while cuffed he was placed in an agent's car and driven back to his home. It was a five minute drive. At his home, the agents backed the car in so he could not see the entrance to his house. At that point, Vanessa came outside and they let her get into the car with him. She was scared and he was "pretty emotional" himself. He tried to comfort Vanessa, who was in her pajamas,

explaining to her about his drug habit and that the agents wanted to come into their home. This is what he told Vanessa:

Q. Tell the judge in your own words what happened when you spoke to Vanessa after you were arrested.

A. She had came outside and they let her get into the car. I was pretty emotional myself.

She was scared, not knowing what was going on, and I was trying to comfort her and explain to her, you know, let her know about my drug habit, let her know what was going, that they wanted to come into the home.

And they wanted to know if I would give them consent. I told her that I wanted to speak to her first before any of this, just to let her know, you know, the truth about myself.

Tr. at 254.

In the car, both he and Vanessa were crying. He was still suffering from the affects of the heroin he used that day. Cummings was having hot flashes and his muscles were aching. One of the agents opened the car door and asked them if they were going to consent. He said no. According to Cummings the agents then told him "If I didn't consent that they would lock her up." Tr. at 256. Apparently before he could answer, one of the agents said, "Let's take this inside the house." So that Cummings testified that he never consented to the search nor did he sign any documents while he was sitting in the car.

The agents then took Cummings and Vanessa into their apartment and sat them down on the couch near the entrance way. There was a coffee table in front of the couch and, according to Cummings, there were no drugs or guns on the coffee table. Meanwhile, the agents were "walking all

around, back and forth, tearing through stuff." Tr. at 258. They were apparently looking throughout the apartment. Then an agent brought a paper and asked Cummings to sign it. He said it was a consent to search. Cummings said he did not want to sign it. Then he was told that if he did not sign it they would arrest Vanessa. So, he signed the paper and was later told that it was a "consent to search" form. Then the agents "forced" Vanessa to also sign the paper. Cummings testified that prior to signing the consent to search form, none of the agents gave him any of the *Miranda* warnings. He was then walked out of his house while still cuffed. His mother was parked outside in the driveway and she hugged him and kissed him on the cheek and he was placed in the agent's car. The car then drove from the scene, and he had still not received *Miranda* warnings. He has been under arrest since March 11, 2010.

On cross-examination, it was brought out that Cummings had a prior felony conviction. He knows that as a prior felon, he is not allowed to have a gun or have heroin in his house. Vanessa did not know anything about the drugs. He was not "in the right frame of mind," being under the influence of heroin. Surprisingly, Cummings testified that he had consumed 20 to 30 bags of heroin that morning, March 11th, before he left the house. He sniffed the heroin in his bathroom. The drugs had been kept in his safe in his apartment. They were his drugs. Also, there was a mound of loose heroin in the kitchen under a sheet. According to Cummings, he is a recovering heroin addict. Notwithstanding the heroin on the kitchen table, Ms. Torres did not know that he had a heroin problem. In fact, he testified that Vanessa first became aware that he had a heroin problem when he was sitting in the back of the agent's vehicle, after the search of the house. This testimony by Cummings is difficult to accept, and in the Court's view not credible. Significantly, Cummings testified that no agents entered his house before he did.

Cummings was shown the consent to search form. Gov't Ex. 27. He acknowledged that both he and Vanessa signed the consent form. However, he testified that the agents entered his house before he signed the form. Also, Cummings testified that he signed the evidence bag that contained the money that was seized. He stated that he was not in any way forced to sign the evidence bag; even though the bag itself provides for a person to write "refused" to sign. There was no coercion in his signing the evidence bag containing the heroin found in his apartment.

Cummings testified that he had two prior convictions. The first was a 2002 drug felony in which he was arrested in his car for cocaine and a loaded firearm. The second was a 2008 misdemeanor criminal possession of a controlled substance. He met Vanessa Torres though the internet two or three years ago, prior to his 2008 drug conviction. He did not tell Vanessa about his 2008 conviction. While living with Ms. Torres he was doing heroin every day. He was doing "anywhere from one to five bundles of heroin every day." According to Cummings, Ms. Torres did not know of his heavy drug habit, "She was never around." Tr. at 289. He never snorted heroin in her presence. However, he left the drugs in the kitchen under a sheet when he left the apartment.

Cummings denied that he was in the business of selling heroin and that the drugs recovered in his house were all for his personal use. This statement was obviously not true, as his later testimony revealed. The heroin in his house was in individual glassine baggies. Also found was a stamping device in his house. He

stamped the glassine bags. He put the heroin in the glassine bags and stamped the bags with the Sopranos logo. Significantly, Cummings then admitted to selling heroin to support his habit.

Q. So you are saying that you took heroin out of glassine bags, dumped it on a tray, and you were going to take the heroin and put it back in glassine bags that were stamped by you.

Correct?

MR. TOMAO: Objection, your Honor.

THE COURT: Overruled.

A. Correct.

Q. Why?

A. Why would I put it back?

Q. Yes.

A. To get my money back.

Q. To get your money back from the person who sold you the drugs?

A. No.

MR. TOMAO: Objection to the form of the question, your Honor.

THE COURT: Overruled.

BY MR. ROSE:

Q. What do you mean by to get your money back?

A. To sell what I purchased to make my money back to support my habit.

Q. So it wasn't for personal use.

You were now selling, you are admitting to selling the heroin that was in the house?

MR. TOMAO: Objection, your Honor.

THE COURT: Overruled.

A. To support my habit, yes.

Q. So the purpose of putting it back in the bags marked Soprano's was so that you could then take those Soprano's glassine filled with heroin, right, and take them and sell them?

A. To support my habit, yes.

Q. How long were you selling heroin to support your habit?

MR. TOMAO: Objection, your Honor.

THE COURT: Overruled.

A. Maybe a few months.

Q. A few months.

You were arrested March 11, 2010. Were you selling heroin to support your habit in February?

MR. TOMAO: Objection.

THE COURT: Overruled.

A. Yes.

Q. Were you selling in January of that year?

MR. TOMAO: Objection.

THE COURT: Overruled.

A. Yes.

Q. Were you selling December of 2009?

MR. TOMAO: Objection.

THE COURT: Overruled.

A. I don't believe so.

Tr. at 303–305.

That day, in the morning, Cummings took 20 to 30 bags of heroin of poor quality. It made him sick and he threw up in DEA headquarters. In addition to the drugs, Cummings kept guns in his house. He kept the guns in a safe. However, the guns were found by the agents on the table in the living room. As for his employment, Cummings stated that he is an artist and sold his music.

On further cross-examination, the Assistant United States Attorney had Cummings retrace his steps on March 11th. The defendant left his house at about 1 pm and went to a Dairy Barn and then to a Waldbaums parking lot. He pulled in and pulled right out of the parking lot. He became aware that a black car was following him. Cummings knew why the car was following him, "Cause it was my co-defendant." Tr. at 319. His co-defendant was Jude Innocent. He then went a cou-

ple of blocks from the parking lot and he pulled over to the side of the road so that Innocent could get into his car.

Q. At some point you pulled over on the side of the road.

Correct?

A. Yes.

Q. And you said that you codefendant got out of his car and entered your car?

A. Yes.

Q. Why?

MR. TOMAO: Objection, your Honor.

THE COURT: Overruled.

A. So he could get into my vehicle.

Q. Why did he get out of his car to get into your vehicle?

A. So we could talk.

Q. What were you going to talk about?

A. Me giving him the drugs.

Q. And you are talking about the drugs that were recovered from the codefendant on March 11, 2010?

A. Yes.

Tr. at 320.

Further, Cummings testified that he had spoken to Mr. Innocent earlier that day; they agreed to meet at the Waldbaums parking lot and he would follow Cummings' car. The purpose of the meeting with Jude Innocent was to sell him heroin. He sold Mr. Innocent four sleeves of heroin at $500 per sleeve.

Q. The purpose of you meeting with Jude Innocent was to sell him heroin, is that correct?

A. Yes.

Q. Did he pay you for the heroin?

A. Yes.

Q. How much heroin were you planning on selling him that day?

A. Four sleeves.

Q. How much were you selling the sleeves for?

A. I believe it was $500.

Q. I'm sorry.

You are saying the total price of all the drugs you were planning on selling to your codefendant was $500?

A. No.

It was $500 each sleeve.

\* \* \* \* \* \*

Q. Let me break it down.

You bundled the drugs into sleeves, correct?

A. Correct.

Q. How many packages are in—is each glassine put in a bundle and then put in a sleeve?

A. Yes.

Q. How many packages are in a bundle?

A. Ten.

Q. And how many bundles are in a sleeve?

A. Ten.

\* \* \* \* \* \*

Q. Did you tell him that it was a certain price per glassine?

Did you say it was a certain price per bundle or per sleeve?

A. I told him per sleeve.

Q. And how much was each sleeve?

A. $500.

Q. $500?

A. Yes.

Q. And you said that you sold him four sleeves?

A. Yes.

Tr. at 323, 324 and 325.

Cummings testified that he had no idea what his *Miranda* rights were. The Court doubts the veracity of that testimony. Es-

pecially for a person who had been arrested and convicted of crimes in 2002 and 2008. However, his knowledge of the *Miranda* rights would not excuse the failure to appropriately give him his *Miranda* rights, if required. Again, relating the events of March 11th, Cummings testified that an unmarked car pulled up in front of his car with lights flashing. It was a red light flashing on the dashboard. A man said to put his hands where he could see them. Then the man opened his car door and pulled him out. Prior to that time, Cummings had given Mr. Innocent the heroin and received money from him. The money was bundled in rubber bands. Each bundle was two or three inches thick, stacked on top of each other. After Cummings received the money from Mr. Innocent, he saw the flashing lights coming down the block, so he stuffed the money in between his seat and the console on the side where he was sitting, all the way to the floor of the vehicle. According to Cummings, the cash was not visible. This all happened "within a minute" after he received the money for the drugs.

Cummings testified that no agents entered his house before he and Ms. Torres entered the house. When Ms. Torres was brought to his vehicle she was in pajamas and visibly upset. He had a surveillance camera set up in one of the windows in his apartment. When he went back into his house his guns and drug paraphernalia were not on the table. There might have been a bag of chips and a soda can on the table. He did not see the agents put the guns or the drug paraphernalia on the table, and he does not know how the gun got to the table from under the mattress or in a drawer.

Strangely, Cummings did not recall speaking to the DEA agents at their office after he was arrested. After he was brought to the DEA headquarters, he was taken to a precinct where he slept overnight. At the time, he was going through withdrawal symptoms including achy bones, muscle spasms, nausea and depression. The next day, the defendant was brought to this courthouse. He was still going through withdrawal symptoms of depression, dizziness and nausea; his bones ached and he was uncomfortable. When he went before a judge, he still had symptoms and hot flashes. Prior to seeing the judge, he spoke to a pre-trial services officer. He does not recall what he told the pre-trial services officers about his recent drug use so that he can not verify the pre-trial services report that said he had last taken heroin three days before. While in the Nassau County Correctional Center, the defendant received treatment for heroin addiction in the DART program.

Cummings testified that he kept his two guns in the safe in his bedroom. He hid the contents from Ms. Torres. However, he had one of the guns under the mattress while she was sleeping. When he finished using each glassine of heroin, he flushed the glassine down the toilet so that Ms. Torres would not know he was snorting heroin.

Again, Cummings stated that he was forced to sign the consent because the agents were "taunting him they would lock my fiancee up ..." Tr. at 372. Also, he testified that because of his heroin usage on March 11th, he could remember things earlier in the day, but could not remember things later in the same day.

With Cummings' testimony, the Hearing terminated.

## II. THE POST–HEARING LETTER MOTION BY THE GOVERNMENT DATED NOVEMBER 16, 2010

After October 29, 2010, the last day of the hearing, the Government wrote to the Court on November 16, 2010 and offered

in evidence, "for impeachment purposes," the Pretrial Services Report for Robert Cummings Jr. prepared by Pretrial Services Officer Donna Mackey on March 12, 2010. (Govt. Ex. 1 for Identification). This offer was opposed by the defendant in a letter dated November 16, 2010.

The Court denies the application by the Government on the ground that it was made after the testimony had been concluded and without any opportunity for Cummings to defend against the admission, except by letter. Due process considerations required the Government to offer the Report during the Hearing, not by way of a letter thereafter.

## III. *DISCUSSION*

Initially, prior to any discussion of the law or the Court's determinations, the Court takes note of (1) the length of counsels' memoranda and (2) the use of footnotes by counsel for the defendant and the Government. Having nothing to do with this Court's determinations, the Court notes that both attorneys did not adhere to the Court's rules with regard to motion practice. These rules apply to both civil and criminal cases. Rule II entitled "Form of Replies" states:

"A–Footnotes Not Permitted. Footnotes are not permitted in any papers, including letter, filed with the Court."

Rule II entitled "Motion Practices," states at Section B(I), "Memoranda of law shall not contain footnotes."

Also, Rule IV at Section B(I) states: "Unless prior permission has been granted, memoranda of law in support of and in opposition to motions are limited to 25 pages, and reply memoranda are limited to 10 pages."

The Court notes that the defendant's Post Hearing Memorandum of Law, otherwise a very fine well drawn document, consists of 39 pages with 10 footnotes. The Government's Memorandum of Law in Opposition, also a very good presentation, consists of 36 pages and one footnote. The defendant's Post Hearing Reply Memorandum of Law is 29 pages in length with 15 footnotes.

This Court is not the only tribunal to have had a problem with footnotes. As New Jersey Supreme Court Justice Robert L. Clifford stated:

> [Footnotes] distract, 'they cause the reader to droop the eyes; to absorb what is usually a monumental piece of irrelevancy of pseudo-scholarship but is sometimes—as here—a significant pronouncement that rightly belongs in the text; and then to return, without skipping a beat, to the point of departure on the upper part of the page' ...

> 'The whole irritating process points up the soundness of John Barrymore's observation.' Barrymore, he recalled, once said that reading footnotes was 'like having to run downstairs to answer the doorbell during the first night of the honeymoon.'

*In re Opinion 662 of the Advisory Comm. on Prof. Ethics,* 133 N.J. 22, 33, 626 A.2d 1084, 1089 (1993) (Clifford, J. concurring). Furthermore, in a criminal case, the Second Circuit has indicated that:

> We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review. The enormous volume of briefs and arguments pressed on each panel of the court at every sitting precludes our scouring through footnotes in search of some possibly meritorious point that counsel did not consider of sufficient importance to include as part of the argument.

*United States v. Restrepo,* 986 F.2d 1462, 1463 (2d Cir.1993); *see also Norton v.*

*Sam's Club, et al.,* 145 F.3d 114, 117 (2d Cir.1998).

Please conform to the Court's rules in the future. Now, to the merits.

## A. *The Defendant's Contentions*

The Court discerns six contentions by the defendant leading to his motion to suppress the stop, arrest, interrogation, the search of his apartment and his statements.

1. The agents lacked reasonable suspicion to justify an investigative stop of the defendant Robert Cummings.

2. The agents lacked probable cause to arrest the defendant Robert Cummings.

3. The agents improperly questioned the defendant Robert Cummings without giving him the *Miranda* warnings.

4. The agents searched the residence of the defendant Robert Cummings without his valid consent and all evidence seized should be suppressed.

5. The agents improperly delayed the arraignment of the defendant Robert Cummings so they could further investigate him.

6. The agents deliberately destroyed evidence.

The defendant further contends that as a result of this illegal stop, arrest, investigation and search, all the evidence derived from the activities must be suppressed. It is interesting that the defendant concedes that "[f]ew significant facts were disputed in this hearing with two glaring exceptions: one was whether the search of the Cummings' residence was based on consent; the other is whether probable cause existed in the time the agents' arrested Mr. Cummings. (Dft's Post Hearing Memorandum at 3).

## B. *As to the Automotive Terry Stop*

■ We start with the basic rule in criminal law; where the agents have reasonable suspicion of drug trafficking, they are permitted to execute a *Terry* Stop and a frisk for weapons. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Reasonable suspicion exists if the stop is warranted by the totality of the circumstances. *United States v. Arvizu,* 534 U.S. 266, 273–74, 122 S.Ct. 744, 750–51, 151 L.Ed.2d 740 (2002). Reasonable suspicion has been defined as the quantum of knowledge sufficient to induce an ordinary prudent and cautious person under the circumstances to believe that criminal activity is at hand.

In *United States v. Elmore,* 482 F.3d 172, 178–79 (2d Cir.2007), the basis for the *Terry* stop is well set forth, as follows:

Under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), police may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot, and may frisk him if they reasonably believe he is armed and dangerous. *United States v. Colon,* 250 F.3d 130, 134 (2d Cir.2001). When a suspect is stopped in a car, the police may perform a limited search of the passenger compartment if they reasonably believe that he is dangerous and may gain immediate control of a weapon. *Michigan v. Long,* 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). A *Terry* stop represents an intermediate response allowing police to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest. *Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or hunch." [*Alabama v.*] *White,* 496 U.S.

[325] at 329–30, 110 S.Ct. 2412 [110 L.Ed.2d 301 (1990)] (internal quotation marks omitted). Police "must be able to point to specific and articulable facts which, taken together with rational references from those facts, reasonably warrant [the] intrusion [on a citizen's liberty interest]." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. Like probable cause, reasonable suspicion is determined based on the totality of the circumstances but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 273–74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

\* \* \* \* \* \*

Even a tip from a completely anonymous informant—though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable, see *White*, 496 U.S. at 329, 110 S.Ct. 2412—can form the basis of reasonable suspicion or probable cause if it is sufficiently corroborated.

\* \* \* \* \* \*

The degree of corroboration required for a finding of reasonable suspicion is obviously less. *White*, 496 U.S. at 330–31, 110 S.Ct. 2412.

■ In this case, the agents executed a *Terry* stop of the defendant's Escalade vehicle, based upon information developed over the course of an investigation into the defendant's suspected drug trafficking from his residence over the period of two months, coupled with the incident involving the Escalade and the car following it. This investigation commenced in January 2010, when the Smithtown Department of Public Safety received an anonymous letter which indicated that heroin trafficking was occurring in the maintenance yard of the Smithtown Highway Department. Based on that information, on February 5, 2010 federal and state law enforcement officers in a DEA Task Force arrested two men for possession of heroin. One of the men arrested was Nick Dirienzo, who advised them the source of his heroin was a Smithtown Highway Department employee named Dennis Manning. Investigator Thomas Lohmann received information from a confidential witness that the source of Manning's heroin was a residence located at 270 North Country Road in Smithtown. In addition, the confidential source also advised that Manning obtained his heroin at the target residence on a daily basis during work breaks. Also, a retired New York City police detective observed and reported suspicious vehicular activity at the target residence. Based on all of this information, the DEA Task Force initiated an investigation as to whether there was heroin trafficking at 270 North Country Road in Smithtown.

Surveillance of the target residence on four days in February 2010, corroborated the information received that Manning was visiting the target residence on a daily basis. The DEA Task Force also conducted a background check on the defendant, which indicated that he had two prior drug convictions, in each incident while in possession of a weapon. Tr. at 89, 93, 96, 97 and 98.

On March 11, 2010 at approximately 1:00 pm, the defendant was observed leaving the target resident in his Cadillac Escalade. The defendant drove the Escalade into a Dairy Barn drive-thru convenience store at the intersection of Route 25 and Route 111. The defendant left the Dairy Barn and drove into the adjacent shopping center parking lot. The defendant's Escalade slowly circled the parking lot when a second car, a Chevrolet Sport Utility Vehicle, began to follow the defendant's Esca-

lade. Both vehicles left the parking lot, proceeded south on Route 111 and entered a quiet residential street, Darling Avenue, and both vehicles pulled over to the side of the road near a wooded area of the street. The co-defendant Jude Innocent exited the Chevrolet car and entered the passenger side of the Escalade.

The Court notes that it credits the agents' version of the events which occurred at the scene of the arrest. At approximately 1:09 pm, while the defendant and Mr. Innocent were in the Escalade, Agent Antonucci activated his police lights and pulled his vehicle in front of the Escalade. The driver's side window was open. Agent Antonucci told the defendant to put his hands on the steering wheel and he opened the driver's side door. He saw a stack of money on Cummings' lap. He then removed the defendant from the vehicle. At the same time, other law enforcement officers removed Mr. Innocent from the passenger side and found four sleeves of heroin in his sweatshirt front pockets. The four sleeves of heroin contained 400 individual glassine envelopes stamped "Sopranos." At that point, both the defendant and Mr. Innocent were placed under arrest. During a patdown search an additional quantity of cash was found in the defendant's pockets. The money seized from the defendant totaled $2,708.

■ "The touchstone of the Fourth Amendment is reasonableness" not bright-line rules. *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Robinette*, 519 U.S. at 39, 117 S.Ct. 417; *see also United States v. Drayton*, 536 U.S. 194, 206–07, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002); *Schneckloth v. Bustamonte*, 412 U.S. 218, 232–33, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). So that the Court's focus must be directed on whether the conduct of the agents was "reasonable" in view of the totality of the circumstances.

It is also well-established that police officers, when approaching a person seated in an automobile, face an inordinate risk. *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), and, accordingly, may direct a driver to exit his vehicle out of a concern for their safety even though they may lack a specific reason for believing that the driver is in possession of a weapon. *New York v. Class*, 475 U.S. 106, 115, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986).

■ "Under the 'automobile exception' to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir.2004) (citing *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996)). Also as the Second Circuit stated in *United States v. Gagnon*, 373 F.3d 230, 233 (2d Cir.2004):

> Furthermore, when the police possess probable cause to believe a vehicle contains contraband, "they may conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages in the vehicle." *United States v. Cruz*, 834 F.2d 47, 51 (2d Cir.1987) (citing *United States v. Ross*, 456 U.S. 798, 821 & n. 28, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)). The automobile exception is justified because a person's expectation of privacy in a vehicle is less than his or her expectation of privacy in a home and because a vehicle is readily movable. *See California v. Carney*, 471 U.S. 386, 390–92, 105

S.Ct. 2066, 85 L.Ed.2d 406 (1985); *United States v. Paulino,* 850 F.2d 93, 95–96 (2d Cir.1988).

■■■ Also, as explained in *Terry v. Ohio,* an investigatory traffic stop does not require probable cause, and such a stop is permissible if the "officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." 392 U.S. at 31, 88 S.Ct. 1868. "A police officer acting on reasonable suspicion that criminal activity is afoot and on an articulable basis to fear for his [or her] own safety may intrude, upon the person or personal effects of the suspect only to the extent that is actually necessary to protect himself [or herself] from harm." *People v. Torres,* 74 N.Y.2d 224, 226, 544 N.Y.S.2d 796, 797, 543 N.E.2d 61, 62 (1989).

Here, considering the totality of the circumstances, the agents had reasonable suspicion to believe that Cummings was engaged in illegal drug activity. The rule is summarized in the syllabus of the decision in *United States v. Arvizu,* 534 U.S. 266, 267, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002):

Held: Considering the totality of the circumstances and giving due weight to the factual inferences drawn by Stoddard and the District Court Judge, Stoddard had reasonable suspicion to believe that respondent was engaged in illegal activity. Because the "balance between the public interest and the individual's right to personal security," *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607, tilts in favor of a standard less than probable cause in brief investigatory stops of persons or vehicles, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "may be afoot," *United States v. Sokolow,* 490

U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1. In making reasonable-suspicion determinations, reviewing courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *See, e.g., United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621. This process allows officers to draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available. *Id.* at 418, 101 S.Ct. 690.

\*　　\*　　\*　　\*　　\*　　\*

Although each of the factors alone is susceptible to innocent explanation, and some factors are more probative than others, taken together, they sufficed to form a particularized and objective basis for stopping the vehicle. Pp. 6–11.

These are among the circumstances known to the agents in the field at the time of the traffic stop. In late January 2010, the Smithtown Department received an anonymous letter that heroin trafficking was taking place in the maintenance yard of the Smithtown Highway Department; on February 5, 2010, DEA Agents arrested two employees of the Smithtown Highway Department for possession of heroin including Nick Dirienzo who stated that the source of the heroin was another Smithtown Highway Department employee named Dennis Manning; seven glassine envelopes of heroin were recovered from Dirienzo. Agent Antonucci was told by a Public Safety Officer and a Park Ranger, Thomas Lohmann, that Dennis Manning's source of heroin was at 270 North Country Road in Smithtown. Previously, experienced law enforcement officers had observed what they believed to be suspicious activity at 270 North Country Road in Smithtown in that individuals went into the

residence for relatively short stays and there were vehicles pulling up and in and out of the residence area.

Based on this information, Special Agent Antonucci conducted a surveillance at 270 North Country Road. During which time, at the residence, he observed a white Cadillac Escalade bearing New York plate number EVY8194 registered to Robert L. Cummings; he observed Manning enter the residence for short periods of time in the morning; a criminal history check on Robert Cummings revealed that there were two prior convictions of Cummings; the first was in 2002, for possession with intent to distribute narcotics involving possession of a loaded firearm with a plea of guilty to a felony possession of narcotics; the second, more recently, in 2008, when he was arrested for possession of a controlled substance again involving a firearm, and a plea of guilty to a misdemeanor possession of a controlled substance.

In addition, surveillance at the property on five or six occasions from February 11, 2010 through March 11, 2010, revealed that Dennis Manning was observed in or near the vicinity of 270 North Country Road and the Cadillac Escalade was also present, including a February 24, 2010 surveillance which revealed that Dennis Manning in a Smithtown Highway Department truck at 270 North Country Road, entering the building for approximately five minutes, and left.

On February 25, 2010, agents observed a meeting between Cummings and his white Escalade, and a Smithtown Highway Department snow removal truck driven by Manning at the crest of a hill; at which time Manning, exited the truck and entered the Cummings vehicle for approximately two to three minutes, exited the vehicle, re-entered the truck and both vehicles departed.

These observations came to a climax on March 11, 2010, when at approximately 12:58 pm, Cummings entered the white Cadillac, drove south and pulled into a Dairy Barn; drove through the purchasing window, headed south and entered an adjacent shopping center lot; drove through the lot, circling slowly at which time a second vehicle, drove behind Cummings' vehicle as it circled the lot; the two vehicles exited the lot and both pulled over to a wooded area when the other driver Jude Innocent exited his vehicle and entered the defendant's Escalade.

Based on the above facts and the law, the Court finds that the Government proved that the agents involved had reasonable suspicion to believe that Robert Cummings was engaged in illegal activity, namely drug dealing; the agents had reasonable suspicion so as to permit a stop or, in this case, to move in front of the Cummings vehicle; and had reasonable suspicion to enable them to open the car door. This brief investigation of activity was supported by reasonable suspicion to believe that criminal activity "may be afoot." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

■ Also, the agents had the right to order the passenger, the co-defendant Jude Innocent out of the car for safety reasons during a traffic stop even without any suspicion of wrongdoing on his part. *See Brendlin v. California,* 551 U.S. 249, 258, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). Citing *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). An officer making a traffic stop may order the passengers to get out of the car pending completion of the stop. *See Maryland v. Wilson,* 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). On the public interest side, the same interest in officer safety is present regardless of whether the occupant of the stopped car is a driver, or a passenger. *Id.* at 413, 117 S.Ct. 882, *see also Wyoming v. Houghton,*

526 U.S. 295, 303, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999); ("Passengers, no less than drivers, possess a reduced expectation of privacy with regard to the property that they transport in cars"); *Ruvalcaba v. Los Angeles,* 64 F.3d 1323, 1327 (9th Cir. 1995). However, while concern for the officer safety may justify ordering a driver and passenger our of a car, "it does not by itself justify the often considerably greater intrusion attending a full field-type search." *Knowles v. Iowa,* 525 U.S. 113, 117, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998).

Accordingly, the Court finds that the agents had reasonable suspicion to justify an investigative stop of the defendant Robert Cummings on March 11th.

### C. *As to the Automobile Search*

Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). One of these established and well delineated exceptions is the automobile exception. Under the automobile exception, "police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Gaskin,* 364 F.3d 438, 456 (2d Cir.2004) (citing from *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996)).

The Supreme Court has justified the automobile exception under two theories: First, a person's expectation of privacy in a vehicle is less than his or her expectation of privacy in a home. *See Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). Second, a vehicle is readily moveable, and urgent circumstances may require a warrantless search. *See Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

In this case, the Court finds that the agents had reasonable suspicion to believe that defendant Cummings was engaged in drug dealing. In addition, they had probable cause to believe that the Cummings' Escalade contained evidence of the crime. Therefore, the limited search which revealed the cash money and the pat down search to Jude Innocent was permissible and lawful.

### D. *As to the Arrest of the Defendant Robert Cummings*

The Government bears the burden of proof as to establishing probable cause for the defendant's arrest on March 11, 2010. *See United States v. Elgisser,* 334 F.2d 103, 110 (2d Cir.1964). The Fourth Amendment protects "the right of the people to be secure in their persons ... against unreasonable searches and seizures." A warrantless arrest is unreasonable under the Fourth Amendment unless the arresting officer has probable cause to believe a crime has been or is being committed. *Devenpeck v. Alford,* 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). Probable cause exists when the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Walczyk v. Rio,* 496 F.3d 139, 156 (2d Cir.2007) (quoting from *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (internal quotation marks omitted)).

With regard to this familiar and oft used concept of "probable cause", in further explanation, the Supreme Court has repeatedly stated that the probable cause standard is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not

legal technicians, act." *Maryland v. Pringle,* 540 U.S. 366, 370, 124 S.Ct. 795, 799–800, 157 L.Ed.2d 769 (2003) (quoting *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

As stated in *United States v. Delossantos,* 536 F.3d 155, 159 (2d Cir.2008), in making this determination, "a court must examine the totality of the circumstances of a given arrest ... [and] these circumstances must be considered from the perspective of a reasonable police officer in light of his training and experience."

■ In this case, it is clear that the Government established probable cause to arrest Robert Cummings at the scene of the automotive *Terry* stop. The agents were permitted to patdown the co-defendant Jude Innocent. They discovered four sleeves of heroin in his sweatshirt pocket. In addition, Agent Antonucci observed a large bundle of cash on the defendant's lap prior to removing him from the vehicle. Based on the totality of these circumstances, the agents clearly had probable cause to arrest both defendants for drug dealing. The motion of the defendant Robert Cummings for an Order pursuant to Rule 12 suppressing the evidence obtained by the Government agents after approaching the defendant's vehicle, searching the vehicle and arresting the defendant for drug dealing, is denied.

**E.** *As to the Statements Obtained from the Defendant Prior to Giving Him a Miranda Warning*

■ The Supreme Court held in *Miranda* that a person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way," must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial. A law enforcement officer's obligation to administer *Miranda* warnings attaches, however, "only where there has been such a restriction on a person's freedom as to render him in custody." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977).

In this case, it is undisputed that after the discovery of the heroin in the possession of Mr. Innocent and the wads of cash in the possession of the defendant that both Cummings and Mr. Innocent were under arrest and subject to the tenets of *Miranda.*

■ The question before the Court, apparently unanswered by both counsel, is what statements were made by the defendant after being placed under arrest, either at the scene of the *Terry* stop, or in an agent's car in front of his residence, or, in his residence. This is so, because there is no evidence that he was given the *Miranda* warnings until brought to the DEA headquarters later that afternoon, at approximately 6:50 pm. A review of the record indicates that the following relevant statements were made by the defendant, without having been given the *Miranda* warnings:

(1) Testimony of Agent Antonucci at p. 27:

Q. I'm sorry, who asked?

A. Mr. Cummings asked if he could call at that point. We said it wasn't possible.

Again, he was relaxed, allowed to smoke. It was a calm atmosphere.

We had stated at that point—Agent Egan asked if there was anything in the house to be concerned about. He said there was a pit bull inside and

there was a pistol, which Mr. Cummings stated he had a permit for. Then Mr. Cummings changed the story and said it was a rifle. And then a third time he said it was a pistol-rifle.

(2) Testimony of Agent Antonucci at p. 163:

Q. You are indicating that Mr. Cummings told you there was a weapon inside?

A. Yes.

Q. When did that occur?

A. That occurred at the arrest scene.

Q. After he was arrested?

A. After he was arrested. When Agent Egan said he had a pistol inside for which he had a license, they changed the story. No, it was a rifle. And there was a third story, that there was a pistol-rifle.

Q. So Agent Egan asked if he had a weapon inside?

A. Right, if he had cooperation to go inside. And Agent Egan should know about inside, and the weapon and the dog issue, that we should be aware of about.

Q. So the statement—let me go back. You heard Agent Egan ask him the question, and you heard Mr. Cummings give an answer?

A. Prior to him getting into the vehicle to be driven back to 270 North Country Road, was there anything inside we should know about with Mr. Cummings?

Q. This is after he was cuffed and placed under arrest and everything else?

(3) Testimony of the defendant Robert Cummings at p. 237:

Q. Tell us what you remember him saying.

A. He asked me, I believe there was another agent there or officer that was asking me as well, and at that point, I was brought back to the hood of my vehicle, and they had brought money out, saying that they found that money in the truck.

Q. They showed you money?

A. Yes.

Q. They said they found that money in the truck?

A. Yes.

Q. And did they ask you about that money?

A. Yes.

Q. Do you recall what they said to you and what you said to them at that time?

A. They asked me if that money was mine.

Q. What did you say?

A. I told them no.

(4) Testimony of Robert Cummings at pp. 248, 249:

Q. So when you are out on the street, they are asking you about whether there were drugs in the house.
Did they ask you if there were guns in the house?

A. Yes.

Q. What did they say to you and what did you say to them about guns?

A. They asked me if there was any guns in the home and I told them yes.

Q. Again I have to ask you, at this point in time where you admitted there were guns in the house, had you been given our Miranda warnings?

A. No.

Q. And did you make any statement up to this point in time as to whether there was drugs in the house?

A. At that point I believe I did.

Q. What do you recall being asked at that time and what do you recall saying in response?

A. I'm sorry.
Can you rephrase the question.

Q. Sure.
What did you say about drugs in your house at that point in time?

A. That there was ... I had drugs in my home.

All of these statements were made by the defendant Robert Cummings without any *Miranda* warnings. Accordingly, the Court grants the defendant's motion to suppress all the post arrest statements by the defendant Robert Cummings made at the scene of the *Terry* stop, in front of the defendant's residence and in the residence.

**F. *As to the Statements Made by the Defendant at the DEA District Office After the Miranda Warnings Were Given***

The defendant contends that the statements made by the defendant at the DEA District Office should also be suppressed, notwithstanding the *Miranda* warnings on two grounds. First, the defendant asserts that there was a violation of the time provisions set forth in 18 U.S.C. § 3501(c). Second, the defendant raises the issue of a "deliberate two-stage interrogation" which would invalidate the *Miranda* warnings and cause the suppression of the post-warning inculpatory statements.

**1. *As to the Delay***

As to the timeliness issue, the defendant is relying on the provisions of 18 U.S.C. § 3501, which provides in part as follows:

a confession made or given by a person who is a defendant therein, while such a person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate [magistrate judge] ... if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention.

So that, under the provisions of this statute, a defendant's custodial confession shall not be inadmissible because of delays if the confession was voluntarily made within six hours of his arrest. In this case, the defendant was effectively detained at approximately 1:09 pm. He then gave his post-arrest post-*Miranda* statement at the DEA District Office at approximately 6:50 pm that same day. Therefore, the defendant's statement at the DEA District Office was made within the six-hour window prescribed by the relevant federal statute.

However, even if the delay in obtaining the admission was somewhat more than six hours, the Court finds that it could be valid under the provisions of the same statute which state:

*Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

Here, the delay in obtaining the formal statement at the DEA District Office was caused by the circumstances of the traffic stop; the arrest of the defendant; the time to obtain consent to search; the search; the trip to headquarters; and the same-day processing of the defendant by the DEA Task Force. Under these circum-

stances, the Court finds that any slight delay beyond such six-hour period was reasonable.

### 2. *As to the Alleged "Deliberate Two Stage Interrogation"*

 The defendant's second argument in support of suppression of the statement by the defendant at the DEA District Office is that the statement was "the result of a deliberate two step interrogation technique designed to deprive Mr. Cummings of his rights." (Dft's Post Hearing Reply Memorandum at p. 19). In this regard, the defendant relies upon a recent Second Circuit case, which has been referred to as a "path-defining decision ... which has significant implication for the future of *Miranda* warnings jurisprudence." (*See* "Refining Miranda: Determining Two-Step Interrogations" by Martin Flumenbaum and Brad S. Karp, N.Y. L.J. Jan. 26, 2011). This case is *United States v. Capers,* 627 F.3d 470 (2d Cir.2010). In *Capers,* the defendant was questioned in a U.S. Postal Supervisor's office and admitted that he stole certain money orders, which he turned over to the agents. No *Miranda* warnings had been given. The defendant was then transported to another postal facility, where, less than two hours later, the same Postal Inspector again questioned him and he again confessed. This time, however, he had informed Capers of his *Miranda* rights and he signed a Waiver of Rights form.

The defendant moved to suppress all the inculpatory statements that he made, both before and after the warnings were given. The District Court granted the motion to suppress the statements. Clearly, the unwarned statements would be inadmissible at trial, except for impeachment purposes on cross-examination. Citing several Supreme Court decisions, Judge McKenna also suppressed the warned statements holding that: "The Government has not shown that ... the defendant relinquished

his right to remain silent voluntarily with a full awareness of the rights being warned ..." *United States v. Capers,* No. 06–CR–266, 2007 WL 959300 at *15 (S.D.N.Y. Mar. 29, 2007) (internal quotation marks omitted). In *Capers,* the Second Circuit had to determine if there was a deliberate two-step strategy to improperly obtain incriminating statements. The *Capers* court concluded that the Court "(s)hould review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, recognizing that this inquiry will rely heavily, if not entirely upon objective evidence." 627 F.3d at 479. The Court further ruled that the burden of proof to prove lack of deliberateness would be on the Government, by a preponderance of the evidence. *Id.* at 479–80. In *Capers,* the Court concluded that the Government failed to disprove the deliberate use of a step interrogation technique. The Court based its determination on the following reasons: the Court did not accept the agent's reason for not initially issuing a *Miranda* warning; the considerable similarity of the statements; the same agents being involved; and, importantly, the close temporal proximity of the interrogations, namely that they were only ninety minutes apart. *Id.* at 480–84.

In this case, using the *Capers* elements, the Court finds that the Government has established, by a preponderance of the evidence, that there was no deliberate two-step interrogation of Cummings. First, an important consideration, is that there was no real initial interrogation of Cummings. He was asked a few questions not in the nature of an interrogation. The questions had to do with the automobile search, and the prospective search of the home. The only real interrogation was at the DEA District Office. Also, there was a greater time interval than in *Capers.* Namely, almost six hours in this case. In the Court's view, the Government established,

by a preponderance of the evidence, that there was no deliberate two-stage interrogation of Cummings on March 11, 2010.

Accordingly, the motion by the defendant Cummings to suppress the admissions obtained at the DEA District Office on March 11, 2010 at 6:50 pm or thereafter, is denied.

### G. *As to the Search of the Defendant's Residence*

The issue in this contention is that the agents initiated the search of the defendant's residence prior ·to obtaining any consent. According to the defendant, the agents obtained the written consent to search only after the agents' entered the residence and by using duress. Therefore, says the defendant, the evidence obtained from the search must be suppressed. The resolution of this issue requires the Court to determine a classic issue of fact. Did the ·defendant and Ms. Torres voluntarily consent, both verbally and in writing, to a search of their apartment prior to the agents' entry? The Court finds that the Government has established that both the defendant and Ms. Torres voluntarily consented to the search of their apartment and signed the consent to the search prior to the agents' entry.

 "It is by now well established that while a warrantless search of a home is generally unreasonable and therefore violates the Fourth Amendment, which proscribes 'unreasonable searches,' an individual may consent to a search, thereby rendering it reasonable." *United States v. Garcia,* 56 F.3d 418, 422 (2d Cir.1995), see also *United States v. Kon Yu–Leung,* 910 F.2d 33, 40–41 (2d Cir.1990) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 226–27, 93 S.Ct. 2041, 2043–44, 2047–48, 36 L.Ed.2d 854 (1973)). To ascertain whether a consent is valid, the Courts review the totality of the circumstances to determine whether the consent was a product of that individual's free choice rather than an acquiescence to a show of authority. *Id.* So long as the agents did not coerce the defendant's consent, a search conducted on the basis of a consent is not an unreasonable search. *Schneckloth,* 412 U.S. at 228, 93 S.Ct. at 2048.

Having reviewed the testimony, the Court finds that both the defendant and Vanessa Torres consented, both orally and in writing to a search of their residence, prior to any entry into the apartment. In this regard, the Court credits the testimony of Special Agent Antonucci that he observed the defendant and Ms. Torres voluntarily sign the consent form in the back seat of Agent Antonucci's vehicle.

This was the testimony by Agent Antonucci on cross-examination:

Q. If they are in the back for 10 or 15 minutes, are the doors shut?

A. No.

Q. Are you able to able to overhear the conversation that they had?

A. They were more or less whispering, more or less alluding to the fact that he was under arrest, and they wanted to give us permission to search the place. And I remember her recognition was more or less in agreement that they wished to do it.

Q. It took them 15 minutes to make a decision, right?

A. We gave them time to confer. Nobody rushed them. Again, at some point he was handcuffed in the front, but I don't exactly remember where in the conversation. But they were allowed to speak as long as they need. They were not rushed by law enforcement.

\* \* \* \* \* \*

Q. And the part that says "I freely consent to this search" is also pre-

printed on that form. The people that signed it don't write it there, correct?

A. That's correct.

Q. Earlier, you testified that you were aware that people have a right to refuse consent, correct?

A. Yes.

Q. That right to refuse to consent isn't written on the preprinted form, is it?

A. No.

Q. Would it be fair to say that you didn't handwrite in anything on this form about them having a right to refuse to consent? Correct?

A. That's correct.

Q. Now, where, physically, did Mr. Cummings sign this form?

A. He signed it in the back of the vehicle where he was sitting.

Q. He's in the back and Vanessa is in the back, right?

A. Yes.

Tr. at 162, 167.

The Court further notes that Vanessa Torres was called as a witness. However, she asserted her Fifth Amendment right against self-incrimination and declined to answer most of the questions addressed to her. Jerin Rosas, the paralegal in Mr. Tomao's office, testified that she was present at an interview of Vanessa Torres. According to Ms. Rosas, Ms. Torres was scared and when asked she agreed to the agents entering the house. Ms. Rosas testified that Ms. Torres signed the consent form in the house after the search began. However, nowhere in her notes does it say that Ms. Torres or Mr. Cummings refused to sign the consent to search. The only witness who testified that the consent form was signed in the residence after the agents' entered, was the defendant Robert Cummings.

As to the testimony of the defendant Robert Cummings, the Court finds that portions of his testimony were less than credible. Cummings testified that on March 11th by 1 pm, he had used drugs, namely heroin, "two or maybe three times" and when he left his house he was under the influence of drugs. He was drowsy and his mind was not clear. More was to come. On cross-examination he testified that he had consumed 20 to 30 bags of heroin that morning. He sniffed the heroin in his bathroom. He was doing "anywhere from one to five bundles of heroin every day." His testimony as to his drug use that day is contradicted by the fact that he admitted to Pre Trial Services on March 12, 2010, that he had not used heroin for three days. Notwithstanding the heroin kept in the house and his daily heavy consumption, allegedly 20 or 30 bags of heroin that very morning, Cummings testified that Vanessa Torres did not know he had a heroin problem. According to him, Ms. Torres first became aware of his heroin problem while he was sitting in the back of the agent's vehicle on March 11th. That testimony by Cummings is difficult to accept and is not credible.

Also, while Cummings initially denied that he was in the business of selling heroin, and the drugs in the house were all for his personal use, that statement was not true. Subsequently, he admitted to selling heroin to support his habit. He also admitted to selling drugs to Mr. Innocent on the day of the arrest. Also, strangely, he testified that because of his heroin usage on March 11th that morning, he could remember things earlier in the day, but could not remember things later in the day. In this regard, despite this major heroin use he remembered the issues involving the consent to search but had no memory of his confession later in the day.

The Court finds that the Government established that prior to the entry into the house by the agents, both Robert Cummings and Vanessa Torres voluntarily consented to the search by signing the "consent to search" document while in the agent's vehicle. The search of the house was reasonable. The defendant's motion to suppress the evidence seized from the defendant's residence at 270 North Country Road, Smithtown, New York, is denied.

### H. As to the Alleged Deliberately Destroyed Evidence—the Spoliation Issue

▮ The defendant contends that the agents destroyed "key evidence" by commingling the money seized at the time of the arrest. In this regard, the defense counsel points to the Government's prior Memorandum of Law in Opposition to Defendant's Spoliation Motion, at p. 7, in which the Government agrees that the "seizure of the bundle of cash observed on the defendant's lap which was exchanged for the four sleeves of heroin recovered from the co-defendant inside the defendant's vehicle, is key evidence of the heroin transaction . . ." The defendant contends that the agents commingled the money seized from the vehicle and the money in Cummings' pockets by placing all the money in the same evidence bag and then depositing all the money without ever conducting an inventory. So that, the defendant contends that it is no longer possible to determine how much money was wrapped in rubber bands, which, apparently, was the money exchanged in the drug transaction with Mr. Innocent.

About two weeks after the seizure of the money, Agents Antonucci and Bernard brought the evidence bag to the Brinks Office on Kent Avenue in Brooklyn. A bank employee opened the bag, counted the currency in the bag and prepared a deposit slip reflecting the date, March 22, 2010. The total amount of money deposited was $2,708. Although the co-defendant Mr. Innocent told the agents that he paid Cummings $2,000 for the drugs seized from his pocket, the Government could not verify this amount, because that money was commingled with other money and deposited into a bank account. Thus, according to the defendant, "the agents deprived the defense of the opportunity to effectively cross-examine Mr. Innocent" as to his participation and the truth of his statements.

Further, the defendant contends that the agents' actions in this regard violated their own regulation. In this regard, counsel for the defendant produced a July 9, 1990 DEA Regulation that states, in part,

"All currency seized which is subject to civil forfeiture or criminal forfeiture must be delivered to the USMS utilizing a DEA 48–A for deposit into an SADF within ten days of seizure. Limited exceptions will be granted only when the retention of the currency serves a significant, independent, tangible, evidentiary purpose."

Tr. at 447.

Before going any further, the Court finds that this DEA regulation will not be considered in this analysis. First, the regulation is dated July 9, 1990, almost 10 years prior to the date of the acts we are concerned with. Second, the Court notes that the seized currency *was* deposited within ten days of seizure, even though not by a United States Marshal utilizing a DEA 48–A. So that the alleged violation of this 1990 DEA Regulation will have no bearing on the Court's decision on this issue.

Reviewing the law with regard to spoliation of evidence, as stated in *United States v. Grammatikos,* 633 F.2d 1013, 1019 (2d Cir.1980): "The government has long been on notice of its duty to preserve discover-

able evidence and has been repeatedly warned of the jeopardy in which it places its prosecutions when it disregards this obligation." In this regard, the Supreme Court has clearly laid down the rules regarding spoliation of evidence by the Government. In *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984), the Court held that the destruction of exculpatory evidence rises to a constitutional violation when the evidence "possesses an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

In a subsequent decision after *Trombetta*, the Supreme Court further clarified the rule on spoliation. This decision was and still is the defining case in this field. In *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the Supreme Court held that the Government's failure to preserve exculpatory evidence is not sufficient on its own to provide a constitutional violation. The Court determined that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. 333.

In *United States v. Rastelli*, 870 F.2d 822, 833 (2d Cir.1989), the Second Circuit adopted the tests set forth in *Trombetta* and *Youngblood* and held that in order to succeed on a claim that missing evidence would play a significant role in his defense, and was thus material, a defendant must meet the two prong materiality standard as established in *Trombetta* as well as show that the government acted in bad faith. So that in order to demonstrate a constitutional violation, namely, a due process violation against the government with regard to the commingling of the currency,

referred to as the "destroyed evidence" by the defense, all three of the following elements must be established:

One, the evidence must possess an exculpatory value that was apparent before the evidence was destroyed.

Two, the defendant must be unable to obtain comparable evidence by other reasonable available means; and

Three, the government must have acted in bad faith in destroying the evidence, meaning in this case in commingling of the currency.

*See Id.*

As to the first element, that the currency must possess an exculpatory value, at first blush the money may possess an exculpatory value. The money involved in a drug transaction certainly is an important element. The question however is whether it has an exculpatory value. Who is prejudiced more by the commingling of the currency so that the Government will have difficulty in proving the amount paid for the drugs? The Government has the burden of proof that money was paid for drugs. That burden would be clearer if the drug money had been isolated. On the other hand, the defense states that the Government's duty "covers not only exculpatory material, but also information that could be used to impeach a key government witness." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir.2001); *see also United States v. Yevakpor*, 419 F.Supp.2d 242, 249 (N.D.N.Y.2006).

While the exact amount of the currency does not appear to be of exculpatory value, it may be used to impeach Mr. Innocent, the alleged purchaser, and a key government witness. Therefore, the Court finds that the first element, that the commingled currency may have an exculpatory value, has been met.

As to the second element, that the defendant is unable to obtain comparable evidence, this is also a questionable element. The Government can prove that Mr. Innocent had four sleeves of heroin and there is evidence that he paid $500 for each sleeve. Also, there are photographs of the stacks of money. However, these photographs do not show the amount of the currency. Therefore, again, while not entirely clear, the Court will again find in favor of the defendant as to this element.

As to the third and final element, the Court finds that the defendant failed to establish any bad faith on the part of the Government agents. In the Court's view, the agents could not be deemed to be acting in bad faith when they were simply following DEA policy in bringing the seized cash to the Brinks Bank for deposit. A main portion of the cross-examination of Agent Bernard was to confront him with a 1990 DEA policy stating that all currency seized must be delivered to the United States Marshal Service for deposit. The Court finds that these acts by the agents in following policy considerations, were done in good faith. As this Court previously stated in *United States v. Bielli*, 697 F.Supp.2d 403, 407, 408 (E.D.N.Y.2010), conclusory allegations are insufficient to support a finding of bad faith.

Accordingly, the defendant's motion to either suppress the evidence of the currency seized on March 11, 2010, or to preclude the Government from introducing any evidence relating to the money seized in this case, is denied.

## IV. CONCLUSION

To summarize the various rulings in this multi faceted decision, the Court concludes as follows:

(1) The Court finds that the Government Agents had reasonable suspicion to justify an investigative stop of the Cummings vehicle on March 11, 2010.

(2) The Court finds that the Government Agents had reasonable suspicion to believe that the defendant Cummings was engaged in drug dealing in his car on March 11, 2010. In addition, the Government Agents had probable cause to believe that the Cummings' Escalade vehicle contained evidence of the crime. Therefore, the limited search which revealed the cash money was permissible and lawful.

(3) The defendant's motion to suppress the evidence obtained by the Government Agents after approaching the Cummings' vehicle on March 11, 2010, is denied.

(4) The Government Agents had probable cause to arrest the defendant Robert Cummings for drug dealing on March 11, 2010, at the scene of the *Terry* stop.

(5) The post-arrest statements made by the defendant Robert Cummings at the scene of the *Terry* stop; in front of the defendant's residence; and in the defendant's residence, are all suppressed.

(6) The motion by the defendant Robert Cummings to suppress his statements made at the DEA District Office on March 11, 2010 at 6:50 pm or thereafter, is denied.

(7) The defendant's motion to suppress the evidence seized from the Cummings' residence at 270 North Country Road, Smithtown, New York, is denied.

(8) The defendant's motion to either suppress the evidence of the currency seized on March 11, 2010, or to preclude the Government from introducing any evidence relating to the money seized in this case, is denied.

This case is set down for the selection of a jury and for trial on April 19, 2011 at 10 am.

**SO ORDERED.**